UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
VALJEAN MANUFACTURING INC., MARTIN :
GRUBER, and FRED GRUBER :
 :
                      Plaintiffs, :    03 Civ. 6185 (HB)
 :
         -against- :    **AMENDED**
 :    **OPINION & ORDER**
 :
 :    **ON REMAND**
MICHAEL WERDIGER, INC. and RICHARD :
WERDIGER :
 :
                      Defendants. :
------------------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

       In a Summary Order issued December 6, 2005, the Second Circuit Court of Appeals affirmed in part and vacated in part this Court's February 10, 2005 Amended Opinion and Order. The case was remanded primarily for further clarification with regard to the reasoning in connection with eight discrete issues. The parties submitted additional briefing on these issues and the court held oral argument on March 29, 2006. My original Opinion is clarified as follows.

### I.    BACKGROUND

       The facts as determined by this Court after a four-day bench trial are set forth in detail in the September 2, 2004 Opinion & Order, familiarity with which is presumed. Valjean Mfg. Inc. v. Werdiger, 2004 WL 1948752 (S.D.N.Y. Sept. 2, 2004) (Baer, J.). In short, Valjean Manufacturing, Inc. ("Valjean") and Michael Werdiger, Inc. ("MWI") entered into a Manufacturing and Security Agreement ("MSA") on October 3, 1994. Pursuant to the terms of the MSA, Valjean would manufacture, design, and sell jewelry while MWI provided the finances. In early 2003, both parties complained that the other side owed them money. After failed negotiations, MWI terminated the MSA on June 30, 2003.

       This Court found in its original decision that MWI breached the agreement by its failure to provide an accounting of the relationship as required by the MSA. After an extensive analysis of over 20 specific areas governing this complex relationship between the

1

parties, the matter was divided into five discrete mega-topics,[1] and in the end, MWI was directed to pay Valjean $6,612,486 in damages plus prejudgment interest calculated from the date the complaint was filed, August 18, 2003.

## II. DISCUSSION

Although the parties vacillated as to whether it would be preferable to proceed pursuant to the oral modifications made during the ten-year term of their relationship, they eventually stipulated that it was the MSA which would control. Consequently, any accounting analysis was done pursuant to principles enunciated in the MSA.

*A. Remanded Issues*

Both parties appealed the Amended Order & Opinion. The Second Circuit remanded the case for this Court to clarify the following eight issues: 1) whether and on what basis the Court awarded damages based on the post-termination sales of Indian product, 2) whether conduct by MWI reflected their agreement to pay some or all trade show expenses after December 1995, 3) the Court's basis for deducting a 4% charge from the sales proceeds on Indian-manufactured product, 4) the amount, if any, of sales commissions credited to MWI and the Court's basis for awarding these damages, 5) clarification of the Court's valuation of the costs of loose diamonds, 6) the Court's rationale for acceptance of Valjean expert Regan's assessment of the amount of charges and adjustments due to Valjean, 7) the Court's rationale for the interest award to MWI, and 8) the Court's rationale for the award of prejudgment interest to Valjean starting from the date the complaint was filed, rather than the date MWI breached the contract.

*1. Post-Termination Sales*

The Court of Appeals wrote that this Court did not explicitly address whether post-termination sales of Indian products were included in the damage award and if they were, what the basis was for the award. This Court credited the accounting testimony of Valjean's expert, D. Paul Regan ("Regan"), a Certified Public Accountant and Certified Fraud Examiner, over the testimony of the Owner and CEO of MWI, Richard Werdiger ("Werdiger"). Regan's accounting included credit to Valjean for post-termination sales of

---

[1] The five areas are as follows: 1) proceeds due Valjean pursuant to Section 5.1 of the MSA ("Valjean Payments"), 2) "Contract Labor" billing, 3) "Expense Reimbursements", 4) duty rebate on import jewelry, and 5) "Credits" due MWI.

Indian product,[2] and, both parties correctly note that my opinion included post-termination sales of Indian product. See MWI Memorandum of Law on Remand ("Werdiger Remand Brief") at 7; Valjean Memorandum of Law on Remand ("Valjean Remand Brief") at 3. On remand, MWI argues that there is no basis in the MSA for such a credit. MWI is incorrect.

This Court awarded Valjean the credit for post-termination sales of Indian product pursuant to MSA § 5.1. Section 5.1 recites the method by which MWI would pay Valjean for jewelry sold. MSA § 5.1, Valjean Payments, provides, in relevant part, that:

> Not later than the fifteenth day of each month, commencing November 15, 1994, MWI shall pay to Valjean, for each piece of Jewelry and each Nova/MWI Diamond for which final Sales Proceeds were received in the preceding month (the sum of these payments, a "Valjean Payment") the Sales Proceeds for such Jewelry or Nova/MWI Diamonds minus the MWI Costs associated therewith. The Valjean Payment otherwise then payable shall be reduced by the following items, applied in the following order:
>
> (1) first, the amount of any Credit Adjustments and Customer Support Adjustments outstanding on such date;
> (2) second, interest due and payable on such date on Cash Advances as provided in Section 2.4;
> (3) third, the outstanding principal balance of any Cash Advances; and
> (4) fourth, the amount of any Diamond Value or Precious Metal Value then owed to MWI in accordance with the last sentence of Section 3.3.

At the outset of trial, it was unclear whether the Indian-manufactured goods would be considered product that was manufactured by Valjean or a Valjean subcontractor. This distinction was critical as it determined whether the goods would qualify as Jewelry[3] or Nova/MWI Diamonds[4] under the MSA. But, regardless of its eventual classification as

---

[2] Regan credited Valjean with $59,697,976 in total post-termination revenue (9/03 – 10/94), which included Indian product, whereas MWI credited Valjean with $30,378,050 in total post-termination revenue, a difference of $29,319,926. App. 3 to Plaintiff's Post-Trial Brief.

[3] The MSA defines "Jewelry" as:
[E]ach and every piece of jewelry, other than generic jewelry included as part of Nova/MWI Diamonds manufactured by Valjean or its subcontractors for MWI for sale by Nova/MWI. Jewelry does not include jewelry sold by MWI which is manufactured by Persons other than Valjean or jewelry manufactured by Valjean for MWI on a contract basis as described in Section 3.2(d).

[4] The MSA defines "Nova/MWI Diamonds" as:
[A]ny loose diamonds or generic jewelry sold by Nova/MWI through its sales force and invoiced under the Nova/MWI name to its customer.

Jewelry or Nova/MWI Diamonds, it was undisputed that the MSA entitled Valjean to a share of the proceeds that resulted from the sale of Indian-made goods.[5]

Having credited Regan's calculations, I awarded Valjean damages on post-termination sales of Indian product. Regan included these sales in his calculations pursuant to Section 5.1 of the MSA. MWI argues this was error because § 5.1, on its face, does not impose any obligation on MWI to continue payments to Valjean following termination of the contract. Werdiger Remand Brief at 10-11. Further, it does not appear that § 5.1 survives termination because it was not included in the MSA's survivability clause. Id. at 10. Section 13.12, "Survival of Representations, Warranties, Covenants, and Agreements" provides that:

> All representations, warranties, covenants and agreements made by or on behalf of Valjean herein, or in any certificate, financial statement or other document or instrument delivered by or on behalf of Valjean pursuant to this Agreement, shall survive the execution and delivery of this Agreement and any investigation by MWI.

MSA, § 13.12. MWI also points out that MSA § 12, the only provision that explicitly addresses termination, is restricted to consequences that result from the sale of "Jewelry" and thus, does not apply to Indian goods which this Court found were not "Jewelry."[6]

I am of the same mind, i.e. MSA § 12 would appear to be inapplicable. But here, both parties agreed and an Order was entered on consent that the MSA would apply to all unsold inventory pending trial. As such, it was proper for Regan to conduct an accounting pursuant to MSA § 5.1 that included post-termination sales of Indian product. That Order provided in relevant part that:

> MWI and Valjean, consult and agree, no later than 10/31/03, on an accountant, to be paid in equal shares by the parties, to conduct an accounting beginning from 7/1/03, and covering all sales by Valjean until the termination of this arrangement on 4/30/04, or until further order of this Court.

Order (Oct. 27, 2003). The accountant, Kenneth Biddick, nominated and agreed to by both parties, was unable to complete his accounting under the MSA, pursuant to the above Order, because after six months, both parties fired him.

---

[5] In fact, in MWI's Remand Brief, they don't argue that the MSA does not cover Indian-made goods, rather they contend that they failed to receive a profit from the sale of those goods. See Werdiger Remand Brief at 1-7.
[6] Jewelry only encompasses goods made by Valjean or Valjean subcontractors. MSA, "Jewelry". In my prior Opinion & Order, I found that the Indian manufacturers were not subcontractors of Valjean.

4

The "Biddick fiasco" aside, both parties' agreed that the MSA would be the sole vehicle, or put another way, the bible, at trial. Defendant MWI stated in a pre-trial brief that "[b]ecause MWI and Valjean could not agree on what oral modifications were mutually agreed to with respect to the MSA, the parties agreed to operate exclusively pursuant to the written terms of the MSA, without reference to any alleged modifications or amendments thereto." Werdiger Decl. in Opposition to Motion by Plaintiffs for Leave to Amend ¶ 2. Counsel for MWI reiterated that sentiment at trial. Bressler Opening Argument, Trial Tr. at 30:7-9 ("Now, the parties have agreed that we are operating under the MSA."). All this further supports Regan's accounting for post-termination sales pursuant to MSA § 5.1.

Lastly, in addition to those statements about the parties intent to be governed by the MSA, both parties also stated that their accounting was done pursuant to the MSA. Valjean said in their pre-trial brief that they would "prove its damage under the payment provisions of Section 5.1 of the MSA." Plaintiffs' Statement of Claims and Defenses at 8, n. 1 (Oct. 12, 2004). And MWI testified that "[w]hile there have been modifications to the MSA that the parties operated under, MWI's Accounting has been prepared under the express terms of the Manufacturing and Security Agreement ("MSA") entered into between the parties on October 3, 1994." Werdiger Decl. ¶ 3. There is no reason for me to believe either party did not do just that.

This Court is bound by the stipulated language and the parties cannot now revisit this issue and add a new twist. Having found that § 5.1 governs this issue and having credited Regan's analysis, I was bound to and did award Valjean damages based on post-termination sales of Indian goods.

2. *Trade Show Expenses*

This Court awarded Valjean trade show expenses in the amount of $1,306,123 because I found that it was reasonable for Valjean to presume, under the circumstances of this case, that MWI would cover some of the marketing cost. The Court of Appeals requested clarification of the Court's reasoning.

Marketing costs are addressed in MSA § 3.4. That provision provides that "MWI shall pay for advertising, trade shows and customer marketing programs in an amount, for the period from the date of this Agreement through December 31, 1995, of not less than $200,000 *and thereafter, as determined by Nova/MWI*." (emphasis added). Pretty clearly this required

5

an affirmative act by MWI after December 1995 in order for MWI to be liable for trade show expenses incurred by Valjean. The record demonstrates that such action was taken.

MWI never established a computerized accounting system to calculate payments pursuant to the method set out in the MSA. Martin Gruber, Owner, Chairman of the Board, and Chief Financial Officer of Valjean, testified that MWI stated they "did not have [a] computerized accounting system to calculate the payments in the way provided by the MSA, but they were working on it. . . . This practice continued into 1998, as I kept being told MWI was not yet prepared to calculate the payments per the MSA." M. Gruber Decl. ¶ 21. In fact, according to Valjean's expert, Regan, MWI never put a system in place to capture the information necessary to calculate payments owed Valjean under the contract and that this "system could have been put in place in 1994 when the MSA was signed." Regan Decl. ¶ F(1) – (2). This is all uncontested by MWI.

In an attempt to conduct an accounting of monies owed during the relationship, Werdiger sent an email to Fred Gruber, President of Valjean, on June 10, 2002. This email confirmed an agreement by MWI to cover 100% of the Basel trade show expenses and 50% of the expenses incurred at the Las Vegas and Orlando trade shows until February 28, 2000. The email provided as follows:

> NOVA ACCOUNTING BY CALENDAR YEAR
>  . . .
>
> CHARGES:   . . .
> 50% of Las Vegas and Orlando trade show expenses until Feb. 28, 2000
> 100% of Basel and Couture trade show expenses

Ex. 118, Email from Richard Werdiger, Owner and CEO of MWI, to Fred Gruber, President of Valjean, *Nova Accounting* (June 10, 2002). This concession remained uncontested at trial. On cross-examination, Werdiger testified as follows:

> Q: Do you recognize Plaintiff's Exhibit 118, sir?
>
> A: Yes, I do.
>
> Q: Ok. Under the subject of charges, do you see the line that says 50 percent of Las Vegas and Orlando trade show expenses until February 28, 2000?
>
> A: Yes, I do.

6

Trial Tr. at 247: 10-15. Since this email was sent after December 1995 and clearly stated MWI's intention to cover a portion of the trade show expenses, this Court finds that this is enough to meet the MSA requirement that marketing expenses paid after December 1995 must be "determined by Nova/MWI" in order to be payable. MSA § 3.4. As such, MWI must pay expenses associated with the Las Vegas, Orlando, and Basel, Switzerland trade shows.

Since I inadvertently awarded Valjean all its trade show expenses, I must reduce my original award of $1,306,123 pursuant to the agreement above. The MSA required MWI to pay at least $200,000 in marketing expenses from October 1994 through December 1995. MSA § 3.4 ("MWI shall pay for advertising, trade shows and customer marketing programs in an amount, for the period from the date of this Agreement through December 31, 1995, of not less than $200,000."). Valjean's accounting documents indicate that Valjean did not spend more than $200,000 on trade shows before the end of 1995, thus, MWI is only responsible for $200,000 during this time.[7] Further, the evidence indicates that MWI agreed to cover 100% of the Basel trade show expenses ($209,181)[8] and 50% of the trade show expenses related to the Orlando and Las Vegas shows until February 2000 ($214,419).[9]

Thus, accounting for the costs incurred at the Orlando, Las Vegas, and Basel, Switzerland trade shows, along with the amount owed pursuant to the MSA, MWI is responsible for Valjean's trade show costs in the amount of $623,600.

*3. 4% MWI Charge Awarded for Indian-Manufactured Goods*

In my original Order & Opinion, I found that MWI could only deduct a 4% MWI Charge for all proceeds on Indian-manufactured product. The Court of Appeals could not

---

[7] Valjean only spent approximately $37,975 through the end of 1995.

[8] From 1995 until 2003, Valjean went to the following trade shows each year: Las Vegas (twice a year), New York (twice a year), Orlando, and Basel, Switzerland. M. Gruber Decl. ¶ 65. The numbers provided by Valjean indicate that they spent approximately $1,255,083 on trade show expenses after 1995. See Ex. 99; See also Regan Ex. 2. Since this Court was unable to ascertain how these expenses were allocated by show, this Court assumed that the costs were equally spread among the trade shows, approximately $23,242 per show over this time period. Thus, MWI is responsible for $209,181 to cover 100% of expenses that resulted from the Basel trade shows through 2003.

[9] The numbers provided by Valjean indicate that they spent approximately $428,838 on trade show expenses from January 1996 until February 2000. See Ex. 99; See also Regan Ex. 2. Since Valjean did not allocate these expenses by show, this Court assumed that the costs were equally spread among the trade shows, approximately $17,868 per show over this time period. Thus, MWI's share of the Las Vegas and Orlando shows through February 2000 total $214,419.

7

discern the basis for this Court's assessment of the 4% charge and remanded for clarification on this issue.

MWI Charges are defined as the expenses MWI incurred as a result of performance under the MSA. The MSA provides that:

> "MWI Charges" means MWI's expenses incident to performing this Agreement, including administration, shipping and insurance . . ., which shall be deemed, for one year from the date hereof, to be equal to eight percent of Sales Proceeds in the case of Jewelry and four percent of Sales Proceeds in the case of Nova/MWI Diamonds.

MSA, "MWI Charges." As stated above, the MSA provides for two different rates for MWI charges, 8% for Jewelry and 4% for Nova/MWI Diamonds.

MWI was entitled to a credit for expenses that resulted from their duties under the MSA. If the item was Jewelry, MWI was owed an 8% credit and if the item was either generic jewelry or loose diamonds, MWI was owed a 4% credit. MSA, "MWI Charges." The 4% MWI charge for Indian-manufactured goods was applicable here because I found that these goods were not Jewelry. As defined in the MSA:

> "Jewelry" means each and every piece of Jewelry, other than generic jewelry included as part of Nova/MWI Diamonds manufactured by Valjean or its subcontractors for MWI for sale by Nova/MWI.

MSA, "Jewelry". The MSA Jewelry definition specifically excludes "jewelry sold by MWI which is manufactured by Persons other than Valjean or jewelry manufactured by Valjean for MWI on a contract basis." I found that Valjean did not manufacture the Indian goods, nor did they do so on a contract basis. Thus, by definition, Indian-manufactured products were not Jewelry and the MWI charge of 4% applied.

In fact, at oral argument, both parties agreed that the 4% charge applied to Indian-manufactured goods. Counsel for Valjean reaffirmed my finding that the Indian manufacturers were not Valjean subcontractors – "the Indian product was, quote, Nova MWI diamonds within the definition of the MSA" – and, thus not Jewelry subject to an 8% charge. Hearing Tr. at 17:15-21 (Mar. 29, 2006). Nova/MWI Diamonds are defined as "any loose diamonds or generic jewelry sold by Nova/MWI through its sales force and invoiced under the Nova/MWI name to its customer." MSA, "Nova/MWI Diamonds." Since the Indian goods were the responsibility of MWI, they are generic jewelry subject to a 4% charge. Even

8

MWI's counsel conceded at oral argument that the Court's 4% charge was appropriate. See Hearing Tr. at 26:19-20 (Mar. 29, 2006) ("It's not 4 versus 8. We're fine with 4."). Thus, this figure remains the same.

*4. Sales Commissions*

The Court of Appeals sought clarification as to whether the damage award included sales commissions, and if it did, the basis for the award.

Pursuant to the terms of the MSA, MWI is entitled to a credit for sales commissions paid and owed to salespersons. The MSA provides, in relevant part:

> "MWI Costs" means, with respect to any Jewelry or Nova/MWI Diamonds, the sum of (a) the Diamond Value of the diamonds contained in such Jewelry or Nova/MWI Diamonds, (b) the Precious Metal Value contained in such Jewelry or, if consisting of generic jewelry, such Nova/MWI Diamonds, (c) any sales commissions, benefits and mandated employee taxes paid or payable to or for the salesman thereof, and (d) the MWI Charges relating thereto.

MSA, "MWI Costs." The amount of sales proceeds paid to Valjean, must, in accordance with the MSA, be reduced by the sum of the MWI Costs associated with those goods. MSA § 5.1. Thus, MWI is entitled to a credit for these costs.

This Court's damage award did credit MWI for sales commissions paid to the Van Lightner and Nova Sales Forces, employed by Valjean. However, this credit did not include sales commissions paid to the non-Van Lightner Sales Force employed by MWI because Regan's analysis failed to include them. Regan testified that he had "not deducted sales commission from sales made to non-Van Lightner customers since MWI has not provided any contemporaneous records of actual commissions paid." Regan Decl. ¶ B12. Consequently, any sales commissions paid to the non-Van Lightner Sales Force was omitted from the final damage award.

But, as indicated above, MWI Costs include, *inter alia*, "any sales commissions, benefits and mandated employee taxes *paid or payable* to or for the salesman thereof." (emphasis added). Thus, MWI is entitled to a credit not only for sales commissions actually paid to the Van Lightner and non-Van Lightner Sales Forces, but for commissions that are payable to both Sales Forces.

Frank Gruber, President of Valjean Manufacturing, admitted in trial testimony that he was aware that non-Van Lightner salespeople were paid commissions.

9

> Q: So you were aware that the salesmen that worked for MWI were paid a commission, right?
>
> A: Yes.

F. Gruber, Trial Tr. at 71:6-7. Further, Regan, Valjean's accounting expert, admitted that the amount of sales commission paid to the non-Van Lightner Sales Force was an "open item."

> The Witness [Regan]: . . . We disclosed that there were no commissions calculated on certain sales, and I wanted to know what those numbers were. In the absence of knowing, I disclosed that there is no commissions yet included on those [non-Van Lightner sales], and that we would like to know what that number is, rather than guessing.
>
> The Court: So that it is an open item?
>
> The Witness: It is, your Honor.

Regan Testimony, Trial Tr. at 397:1-8. However, Valjean asserts that MWI's claim that they should be credited for sales commissions paid to the non-Van Lightner Sales Force must fail because they did not prove that they "*paid* these commissions to the MWI sales force; instead, MWI only presented an estimate that was not based on any actual payment records." Valjean Appeal Brief at 29. But the MSA provides for a MWI credit both for commissions paid and payable to Valjean and MWI Sales Forces.

Valjean made no attempt to ascertain the amount payable to the non-Van Lightner Sales Force despite numerous opportunities to do so.[10] To this date, Valjean has not submitted an accounting for the amount payable to the non-Van Lightner Sales Force. Thus, it is only reasonable to credit MWI's numbers with regard to the non-Van Lightner Sales Force. As such, MWI is entitled to a credit of $1,190,136. See Defendant's Ex. A at 57549 (stating that MWI paid $1,166,730 in sales commissions for Valjean Design Jewelry); Id. at 57558 (stating that MWI paid $7,202 in sales commissions for California Jewelry); Id. at 57597 (stating that MWI paid $16,204 in sales commissions for MWI Jewelry and loose diamonds sold to Div "V" customers).

---

[10] Valjean has not disputed the fact that they received documents as well as computer tapes of MWI's accounting prior to trial and were sent four boxes of information that documented these sales commissions on January 9, 2006. See, e.g. Valjean Appeal Brief at 29, n. 20 ("The computer tape containing the calculations underlying MWI's estimate was not even provided to Valjean until less than a week before trial."

*5. Diamond Valuation*

The Court of Appeals found the diamond valuation facet of the decision unclear. Specifically, I accepted Regan's analysis which found that MWI understated the cost of loose diamonds by $921,677, but awarded Valjean $3,553,470 for the sale of loose diamonds. For the following reasons, this continues to make sense to me.

The $921,677 figure refers to how much more money would have been due to Valjean if Valjean's expert had utilized MWI's numbers. Valjean's expert testified at trial that "[m]y recollection is that the net result is that we [Valjean] provide slightly higher recovery to MWI than the number MWI is using." Regan Testimony, Trial Tr. at 434:17-19. See also Regan Decl. ¶ D(3)(iv) ("Based on my analysis, MWI has understated the Diamond Value in the Loose Diamond transactions: the Diamond Value that I have calculated for these transactions is higher than MWI's."). According to Regan, MWI understated the cost of loose diamonds by $921,677.

I accepted Regan's analysis that MWI understated the amount they should be credited for their loose diamonds and accepted his finding that MWI was entitled to a $921,677 credit with regard to those diamonds. The Diamond Value for center stones, or loose diamonds, is based on the "size, shape, color, and quality" of the stone. MSA, "Diamond Value." Regan's calculations relied on a Diamond Value for center stones that was approximately 5% greater than the value used by MWI.

> Q: So in your analysis you're giving MWI more money for center stones than MWI is taking under its analysis?
>
> A: Yes.
>
> Q: Do you know by how much?
>
> A: I think it's about 5 percent.

Regan Testimony, Trial Tr. 434:20-24.

But, Regan went on to find that MWI overstated the cost of their "side-stone" diamonds by 21% because "MWI did not price the side stones using cost tables effective at the time of sale." Regan Decl. ¶ D4(i). Instead, MWI used a March 2004 cost table that MWI assumed accurately captured their acquisition costs over a 10-year period. Id. at

11

¶ D4(ii). Regan found that this method was not precise and instead used an adjusted cost table that relied on actual acquisition costs, to the extent that they were available, and increased it by the MSA required 15% profit margin. Regan Trial Tr. 427:19-431:20.

On remand, MWI raises additional arguments with regard to diamond valuation, including Regan's lack of any basis for extrapolating his finding that MWI overstated the cost of princess cut side stones by 21% and using the same figure for baguette side stones. MWI argues that Regan should have calculated the cost of baguette side stones separately, based on the cost information for those diamonds, rather than estimating the cost of baguette side stones using the calculations he relied on for the princess-cut side stones. However, it is undisputed that MWI did not have complete records for the diamond acquisition costs they incurred during their contractual relationship with Valjean. As Regan explained at trial when he was questioned by this Court:

> Q: I note that on the baguette cuts there's no green line [representing actual costs]. Why is that?
>
> A: We don't have the cost information.

Regan Trial Tr. 432:3-5. I credited Regan's testimony that MWI submitted incomplete information with regard to costs incurred for diamond purchases and that Valjean "tended to get summarized information, cost tables which were not based on actual costs. So that rather than actual costs based on invoices, we [Valjean] tended to get summarized tables of information." Trial Tr. 368:12-16. Since I found that MWI failed to provide a more certain method for calculating diamond value, specifically with regard to the baguette stones that lacked complete cost information, this Court will continue to credit Regan's accounting testimony as to this issue.

Thus, after the $921,677 credit for the center stones had been offset by the inflated costs of the side stones, Valjean was entitled to a damage award in the amount of $3,553,470.

*6. Charges and Adjustments*

The Court of Appeals remanded for clarification as to why this Court accepted Regan's accounting with regard to charges and adjustments. As mentioned previously, this Court repeatedly credited the testimony of Regan, a certified, independent forensic accountant with over 30 years of experience over Werdiger, the CEO and Owner of MWI who had no formal accounting training. As such, Regan's finding that the Charges and Adjustments due

12

Valjean totaled $2,393,082 was credited over Werdiger's calculation. Regan's testimony and demeanor, while hardly saint-like, appealed to me as more credible than Werdiger, the party most intimately connected to the other side, namely its Owner and CEO.

*7. Interest Award*

On remand, the Court of Appeals sought an explanation for this Court's award of interest to MWI in the amount of $4,850,149. This interest was awarded based on the cash advances made by MWI to Valjean in the course of their contractual relationship, not on the overpayments totaling approximately $30,140,303 made by MWI to Valjean from September 1994 to approximately December 1996. See Regan Ex. 2, Revised in Accordance with Jan. 31, 2005 Opinion & Order; See also Valjean Appeal Brief at 46 ("[T]he trial court necessarily found, in accepting Regan's analysis, that [] MWI's initial monthly payments to Valjean were greater than the amounts due under the MSA.").

Pursuant to MSA § 2.4, interest accrues on all outstanding cash advances made by MWI to Valjean; thus, MWI collects interest on these monies. Interest accrues "at an annual rate equal to MWI's weighted average cost of funds borrowed from its principal bank lenders." MSA, § 2.4. Cash advances are defined in the MSA as "any draws under the Line of Credit." MSA, "Cash Advances." The Line of Credit refers to Section 2.2 of the MSA. Section 2.2 of the MSA provides that cash advances only occur upon the request of Valjean.

> MWI shall from time to time, upon the request of Valjean, make Cash Advances by wire transfer of available funds to an account specified by Valjean to MWI. In the event this Agreement is terminated or Valjean violates any material provision hereof, all Cash Advances shall, unless otherwise agreed, become immediately due and payable to MWI, together with interest thereon to the date of payment.

MSA, § 2.2.

Under the MSA, Valjean was not paid until MWI received payment for goods. The MSA provided, in relevant part, that "MWI shall pay to Valjean, for each piece of Jewelry and each Nova/MWI Diamond for which final Sales Proceeds *were received* in the preceding month." MSA § 5.1 (emphasis added). But on January 2, 1995, Valjean and MWI entered into an agreement that provided that Valjean would receive funds from MWI before MWI received payment for goods sold. This agreement was reduced to writing on November 6, 1996 and provided in relevant part:

13

> It was mutually agreed on January 2, 1995 that the . . . Michael Werdiger, Inc. payments to Valjean Mfg. Corp. . . . which were for labor, marketing, design and consulting [and] would be 35 percent of the net value of each shipment.

Contract between Gruber and Kleinberg (November 6, 1996); See also Werdiger Decl. ¶ 73 ("This Agreement permitted Valjean to receive money in advance, because the MSA provides that Valjean is paid only after sales proceeds are actually collected by MWI."). According to Mark Gruber, Owner, Chairman of the Board, and Chief Financial Officer of Valjean, this money covered Valjean's operating expenses. See M. Gruber Decl. ¶ 25 ("Before 1998, as we sent MWI our 35% draws, the money MWI sent Valjean on a regular basis covered our expenses, and we kept making jewelry to sell together.").

Until 1999, the line of credit received by Valjean was 35% of the selling price of each piece of jewelry sold under the MSA. Werdiger Decl. ¶ 73 ("Rather than paying Valjean according to Section 5.1 of the MSA, which required MWI to make calculations on a monthly basis, Marty [Martin Gruber] and I agreed that MWI would pay Valjean 35% (for domestic jewelry which included labor) of the selling price of each piece of jewelry sold under the MSA (the "35% Agreement."). From that point forward, Valjean requested weekly payments from Alan Kleinberg, MWI's Vice President, again, purportedly due to Valjean's cash-strapped financial situation. Mark Gruber admitted during the preliminary injunction hearing that he received "just [] enough to run my business, stay in business, whatever, but it's not like I got the final settlement." M. Gruber, Preliminary Injunction Tr. 79:22-24 (Oct. 23, 2003). Further, during these proceedings, Mark Gruber testified that the payments were approximately $100,000 a week.

> Q: Did MWI make wire transfers to Valjean under the agreement?
>
> A: Yes.
>
> Q: And were those wire transfers in a certain amount for a period of time?
>
> A: I looked at the last three years before – before this year, 2003. So during the 2002, 2001 and 2002, we got approximately $15,500,000, which is almost exactly what I would have said, $100,000 a week.

M. Gruber, Preliminary Injunction Tr. at 78:6-13. The weekly payment amount was later reduced in January 2003. Id. at 79:6-10 (Mark Gruber stating that "[it] was -- in 2003 January, the first payments that we got in January, I don't know if it was $40,000 or $60,000,

but it was about half of what we were normally getting, that week. And then it kept going down to where we were getting $45,000 a month."). The payment arrangement documented above remains undisputed.

But even more importantly, Mark Gruber testified during the preliminary injunction hearing that he considered the weekly payments from MWI to Valjean to constitute cash advances.

> Q: So it is your understanding that those $100,000 a week . . . payments, were advances against the Valjean payment?
>
> A: Yes, but it was clear to me, and that's why I wrote this letter, that he wasn't paying me the bare minimum that I expected, and I did – I gave him the numbers of what I had calculated and what information I had and what I thought I should be getting, and what he was paying me, not even half of it or something.

M. Gruber, Preliminary Injunction Tr. 83:12-20 (Oct. 23, 2003).

This arrangement resulted in a net cash advance of $9,094,396 over the 10 year relationship. Ex. A. Since the money was requested by Valjean and used as a line of credit to operate the business, I found it constituted a cash advance as defined in § 2.2 of the MSA. MSA, § 2.2. ("MWI shall from time to time, upon the request of Valjean, make Cash Advances by wire transfer of available funds to an account specified by Valjean to MWI."). This money, the entire cash advance and corresponding interest, was not due MWI until the MSA was terminated.

> In the event this Agreement is terminated or Valjean violates any material provision hereof, all Cash Advances shall, unless otherwise agreed, become immediately due and payable to MWI, together with interest thereon to the date of payment.

MSA, § 2.2.

This Court found that MWI made cash advances to Valjean in the course of their business relationship and I awarded interest on that money as mandated by the MSA. Pursuant to the MSA, "interest shall accrue on all outstanding Cash Advances at an annual rate equal to MWI's weighted average cost of funds borrowed from its principal bank lenders." MSA § 2.4. The average monthly interest rate, based on the bank loan interest rate at that time, ranged from 3.5% to 9.0%. Ex. E. The monthly simple interest rate was multiplied by the cash advance received by Valjean that month. Those figures, totaled over

the course of the relationship, resulted in an interest award of $4,850,149. Ex. A. Thus, for the above reasons, my original interest award of $4,850,149 remains unchanged.

*8. Prejudgment Interest*

This Court awarded Valjean prejudgment interest from the date the complaint was filed. The plaintiff contends that it should be calculated from December 1996, the month when MWI went into debt with Valjean. The Court of Appeals remanded for clarification as to why the complaint filing date was chosen.

It is well-settled that prejudgment interest generally begins to run on a contract at the time of breach or the date payment was due under the contract. WILLISTON ON CONTRACTS §66:112. Under New York law, prejudgment interest should be "computed from the earliest ascertainable date the cause of action existed." NYCPLR § 5001(b). If the precise date is not known, the complaint filing date is an appropriate benchmark. See, e.g., Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994).

The complaint filing date, August 18, 2003, was selected, in large part, as a consequence of the parties' inability to agree on much of anything ever, and certainly not this date, and certainly not prior to trial. It bears repetition that in fact the parties could not even decide, until the eleventh hour, whether they were going to proceed under the MSA or pursuant to various oral modifications. In fact, the demands kept changing until the threat of a preliminary injunction spurred the parties to stipulate to an accountant, which by the way, they had selected to calculate the amounts owed pursuant to the MSA. See Order (Oct. 27, 2003). Valjean then served an Amended Complaint that purported to proceed on the basis of contested oral modifications. Amended Complaint ¶ 12 (Mar. 17, 2004) ("Valjean and MWI adjusted and modified their relationship following execution of the MSA through oral modifications and agreements."). Finally, less than two weeks before trial, the parties decided it might be best to abide by the terms of the MSA. See Plaintiffs' Statement of Claims and Defenses at 8, n. 1 (Oct. 12, 2004) ("Valjean will prove its damage under the payment provisions of Section 5.1 of the MSA.").

Until this issue was decided, it was unclear what method, if any, would be used to conduct an accounting. As mentioned above, this, of course, was after months of work by an accountant the parties finally agreed upon and then fired. Given the tortured history, I

concluded that the complaint filing date was the appropriate date from which to calculate prejudgment interest.

Since this case has been remanded, and we are now faced with multiple judgments, I must also decide when post-judgment interest begins.

Courts concluded that damage awards with no support in the evidence, Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 836 (1990), or where the judgment was vacated "because it lacks a legal basis or requires further factual development," Lewis v. Whelan, 99 F.3d 542, 545-46 (2d Cir. 1996), have not been meaningfully ascertained, and in such a case, this could be a legitimate dispute as to when post-judgment interest began to run. Here, the case was not remanded because there was no support in the evidence. The Court of Appeals simply requested that I clarify the basis for my findings of fact and conclusions of law with respect to eight discrete issues. In two circumstances, I found that MWI was entitled to a monetary credit I had not found in my earlier decision. See Cordero v. De Jesus-Mendez, 922 F.2d 11, 16 (1st Cir. 1990) ("[W]here the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment."), quoted with approval in Lewis v. Whelan, 99 F.3d 542, 545 (2d Cir. 1996).

Here, the February 18, 2005 judgment was ascertained in a meaningful way and the prejudgment interest rate will apply until February 18, 2005, after which the federal T-bill interest rate will apply.[11]

*B. Damage Award*

In sum, the total damage award is calculated as follows. Valjean is entitled to the following: the sum of monthly "Valjean Payments" payable pursuant to § 5.1 of the MSA ($73,514,132),[12] the contract labor payments due under § 3.2 of the MSA ($2,569,991), expense reimbursements due Valjean ($5,342,575),[13] and a duty rebate on import jewelry due Valjean ($278,496). The joint stipulation between Valjean and MWI credited Valjean with

---

[11] February 18, 2005 is the date judgment was entered pursuant to my February 10, 2005 Amended Order & Opinion (*Recalculations Only*).

[12] Valjean Payments consist of the following costs: Jewelry and NOVA/MWI Diamonds Billed by Valjean ($23,536,685), Jewelry billed by MWI ($40,142,082), Adjustment for Jewelry transactions on which MWI Charges exceeded Sales Proceeds ($102,547), Fred Clar & Jewelex Sales ($1,542,129), Loose Diamonds billed by MWI ($3,553,470), MWI Generic Jewelry ($1,611,637), Colored Stones ($632,500), and Charges and Adjustments ($2,393,082).

[13] Expense reimbursements consist of the following costs: freight ($247,256), security ($3,265,568), import products ($718,427), trade shows ($623,600), and FTS payroll expenses from September to November 2003 ($487,724).

the $266,644 for colored stones purchased by Valjean for sale and $50,000 for the Intergold settlement, for a subtotal of $82,021,838.

MWI is entitled to the following credits: Payments to Valjean ($43,305,592), sales commissions to the Van Lightner Sales Force ($23,963,368), sales commissions to the non-Van Lightner Sales Force ($1,190,136), findings[14] ($380,162), damaged diamonds ($283,993), and interest on cash advances ($4,850,149). The joint stipulation between Valjean and MWI credited MWI with the following: import purchases included in MWI payments to Valjean ($582,908), colored stone purchases included in MWI payments to Valjean ($330,259), metal scrap ($886,872), LA Importing ($31,422), Martin and Fred Gruber private sales ($438,413), uninsured salesperson losses ($270,000), Insurance on Valjean premises ($171,401), and, Valjean Shipping Insurance ($597,337), for a total credit of $77,282,012.

When the credits due MWI are subtracted from the total due Valjean, Valjean is entitled to $4,739,826 (excluding interest). This constitutes a reduction of the award in my original opinion and arose in connection with the directions of the Court of Appeals. As each aspect was further explained, these figures emerged more closely.

### III. CONCLUSION

It is hereby ordered that MWI pay Valjean $4,739,826 plus prejudgment interest from August 18, 2003, the date the complaint was filed. The state statutorily-determined simple interest of 9% per year will apply from that date to February 18, 2005, after which the federal T-bill rate will apply. The Clerk of the Court is directed to close all pending motions and remove this case from my docket.

**IT IS SO ORDERED.**

New York, New York
May 10, 2006

_____
U.S.D.J.

---

[14] Findings are "small gold and platinum components used in jewelry." Lisa Skibenes Decl. at ¶ 26.

18