UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VALJEAN MANUFACTURING INC., et al.  :
                                    :    03cv6185(HB)
                Plaintiffs,         :    OPINION & ORDER
                                    :
        -against-                   :
                                    :
MICHAEL WERDIGER, INC., et al.,     :
                                    :
                Defendants.         :
------------------------------------------------------------x

**Honorable HAROLD BAER, JR., District Judge:**

In a second Summary Order issued August 27, 2007, the Second Circuit Court of Appeals affirmed in part and vacated in part this Court's May 18, 2006 Opinion and Order. <u>Valjean Manufacturing Inc., et al. v. Michael Werdiger, Inc., Richard Werdiger</u>, 05-0939-cv, 2007 U.S. App. LEXIS 20475 (2d Cir. Aug. 27, 2007); 03cv6185, 2006 U.S. Dist. LEXIS 30221 (S.D.N.Y. May 18, 2006). The case was remanded to clarify three discrete issues. These issues were briefed by the parties and oral argument was held on February 13, 2008. Thereafter, I asked the parties to submit their calculations or evidence to support the disputed items and provide stipulated calculations where possible. My 2006 Opinion and Order is clarified as follows.

## I. BACKGROUND

The facts as determined by this Court after a four-day bench trial are set forth in the September 2, 2004 Opinion and Order, familiarity with which is presumed. <u>Valjean Mfg. Inc. v. Werdiger</u>, 2004 U.S. Dist. LEXIS 17580, 2004 WL 1948752 (S.D.N.Y. September 2, 2004). Valjean Manufacturing ("Valjean") and Michael Werdiger, Inc. ("MWI") entered into a Manufacturing and Security Agreement ("MSA") on October 3, 1994. Pursuant to the terms of the MSA, Valjean would manufacture, design, and sell jewelry while MWI, also a manufacturer of jewelry, provided the financing. MWI terminated the MSA on June 30, 2003.

I found that MWI breached the agreement by its failure to provide an accounting of the relationship as required by the MSA. I made findings according to five "mega-topics" namely: 1) proceeds due Valjean pursuant to Section 5.1 of the MSA ("Valjean Payments"); 2) "Contract Labor" billing; 3) "Expense Reimbursements,"; 4) duty rebate on import jewelry; and 5) "Credits" due MWI. <u>Valjean</u>, 2006 U.S. Dist. LEXIS 30221, at \*2. I initially awarded

approximately $6.6 million to Valjean and then reduced it to $4,739,826 following remand by the Circuit Court in 2005. The parties appealed portions of that decision. The three issues remaining and resolved by this opinion are: 1) a reassessment of interest due to the Defendant on cash advances made to Valjean throughout the course of the parties' relationship; 2) profit, if any, owed to Defendants for diamonds in Indian-made Jewelry; and 3) whether the Defendant expended $200,000 in trade show and marketing expenses up to December 31, 1995 on behalf of the Plaintiffs, all that was required by the MSA.

## II. DISCUSSION

As noted in an earlier opinion, after much vacillation as to whether the MSA or one or more of the many oral modifications should control, the parties finally decided and agreed to rely on the MSA to determine damages and amounts owed to each party, and it is in reliance on the MSA that my clarifications are based. See Valjean, 2006 U.S. Dist. LEXIS 30221, at *11. The relevant provisions of the MSA relied upon to resolve the issues here are the following: 1) for interest on cash advances, sections 2.2, 2.4 and 5.1 of the MSA; 2) for 15% profit on diamonds in Indian-made jewelry, Definitions for "Diamond Value" and "MWI Costs" and 5.1 of the MSA; and 3) section 3.4 for trade show and marketing expenditures.

### A. Interest

The Second Circuit affirmed my decision to award MWI interest for Cash Advances it made to Valjean during the course of the parties' relationship, but remanded for reconsideration of the amount awarded. Valjean, 2007 U.S. App. LEXIS 20475, at *2. Specifically, the Court sought an explanation as to why I accrued interest from the first advance to the end of the contractual relationship when I had found that MWI had underpaid Valjean from time to time over the course of their relationship. Id., at *3. With that guidance and more briefing and oral argument, I find that the interest number must be adjusted to take account of underpayments by MWI to Valjean. For the reasons below, the $4,850,140 million in interest on Cash Advances is reduced to $615,636.

The MSA was structured to pay Valjean for its manufacture of the jewelry after MWI received payment for the Valjean jewelry it sold. MSA, § 5.1;[1] Valjean, 2006 U.S. Dist. LEXIS

---

[1] Section 5.1 of the MSA is the ultimate basis upon which to determine what MWI owes Valjean for jewelry sold. It provides that each month, "MWI shall pay to Valjean, for each piece of Jewelry and each Nova/MWI Diamond for which final Sales Proceeds were received in the preceding month (the sum of these payments, a "Valjean Payment") the Sales Proceeds for such Jewelry or Nova/MWI Diamonds minus the MWI Costs associated therewith." MSA, §

2

30221, at *25. This is called the "Valjean Payment." Soon after the MSA was negotiated, Valjean required more cash and opined that it could not stay afloat without more money not tied to sales of its jewelry by MWI. The parties then entered into another agreement, the so-called 35% Agreement, which provided that Valjean would receive funds from MWI before MWI received payment for goods sold so that Valjean could cover its operating expenses and continue to produce the jewelry.[2] (MWI Brief on Second Remand, Exh. S, 35% Agreement of Jan. 2, 1995); 2006 U.S. Dist. LEXIS 30221, at *25.

I found, and the Circuit agreed, that advance payments were requested by Valjean as a Cash Advance under the terms of the MSA and that MWI made these Cash Advances to Valjean over the course of their contractual relationship. 2007 App. LEXIS 20475, at *2. Cash Advances are defined as any draws under the "Line of Credit." MSA, "Cash Advances." Section 2.2 of the MSA provides that cash advances only occur upon the request of Valjean. MSA, § 2.2. Interest was to "accrue on all the outstanding Cash Advances [made by MWI to Valjean] at an annual rate equal to MWI's weighted average cost of funds borrowed from its principal bank lenders." MSA, § 2.4. Pursuant to section 5.1 of the MSA, interest on Cash Advances was to be payable monthly.

After an initial advance of $857,005.55 to Valjean in October 1994, the monthly Valjean Payments quickly and consistently exceeded what MWI advanced to Valjean under the 35% Agreement. To the extent that the Cash Advances made according to the 35% Agreement exceeded the Valjean Payment under § 5.1 of the MSA, Valjean owes MWI interest. But once Valjean Payments exceeded Cash Advances to Valjean, and the cumulative balance no longer reflected outstanding amounts owed to MWI, Valjean incurred no further interest.

---

5.1. The Valjean Payment, then due, would be further reduced by "(1) Credit Adjustment and Customer Support Adjustment outstanding; (2) interest due and payable on such date on Cash Advances as provided in §2.4; (3) the outstanding principal balance of any Cash Advances; and (4) the amount of any Diamond Value or Precious Metal Value then owed to MWI in accordance with the last sentence of § 3.3." MSA, § 5.1. Section 3.3 deals with completion of work receipts and is not relevant for this opinion.

[2] The 35% Agreement was reduced to writing on November 6, 1996 and provides in relevant part:
> It was mutually agreed on January 2, 1995 that the Michael Werdiger, Inc. payments to Valjean Mfg. Corp. . . . which were for labor, marketing, design and consulting [and] would be 35 percent of the net value of each shipment.

3

At the end of the relationship, Valjean Payments (i.e. what MWI owed to Valjean) totaled $48,360,629.33,[3] whereas MWI had advanced a total of $43,305,591.92, reflecting total underpayments to Valjean of $5,055,037, excluding Valjean expenses and MWI credits.

MWI's interest calculation of $4,850,140 was based on its incorrect view that it overpaid Valjean a total of $9 million over the course of the relationship. While wrong, this figure remained unchanged, until now, despite clear pronouncements which affected the underlying data.[4] Valjean's expert, Mr. Regan, the only person who has provided accounting data to date, presented a methodology for calculating interest on a monthly basis.[5] According to Valjean's Schedule, after about a year of consistent underpayments as compared to Valjean Payments owed (i.e. by November 15, 1996), the outstanding Valjean principal owed to MWI was satisfied. (Regan Exh. 2.) According to Regan's calculation, Valjean owes interest to MWI in the amount of $185,597.57. While both parties applied interest to divergent base numbers, each applied the annual rate of MWI's weighted average cost of funds borrowed to their estimates of Cash Advances in excess of the Valjean Payments on a monthly basis and then added up the monthly interest without compounding the amounts. (See Regan Exh. 2 and MWI (MWI Exh. A (A-920).)[6] But Regan's estimate of interest does not meet the definition of § 2.4 because it includes Valjean monthly expenses.[7] Nothing in the MSA mentions deducting Valjean expenses to calculate interest on Cash Advances and Valjean provides no support for such an inclusion.

---

[3] This number has been updated to reflect the 2006 Remand Opinion, which adjusted $49,550,000 million in Valjean Payments by $1.19 million for commissions paid to the non-Van Lightner sales force.

[4] For example, MWI continues to rely upon figures I expressly rejected in its calculation of its claimed overpayment of $9,094,296 to Valjean to justify the $4.85 million in accrued interest – the largest figure I rejected was MWI's claim for a credit of $8,792,014 in "Indian Labor," see Amended Opinion and Order February 10, 2005. MWI never thought to adjust its numbers despite my explicit rejection of those amounts.

[5] MWI's own interest calculation submitted at trial, "Werdiger Inc. Exhibit of Amounts Due To / Due From Valjean" was based on its calculation of monthly advances to Valjean minus its estimate of "Valjean Payments," which it found resulted in a net amount owed from Valjean of $9,094,395.91. (MWI Exh. A (A-920).) Thus, MWI's argument that the 35% agreement is controlling and Valjean's methodology is flawed is vitiated by its own methodology. The critical difference between the two parties' calculations for interest is that Valjean included its expenses, whereas MWI included its credits (much of which I rejected in earlier opinions).

[6] Actually, in its February 4, 2005 letter to the Court, Valjean expressly admitted that it owed interest to MWI, however, Valjean contested the basis for the calculation in light of the Court's rulings in January 2005. (Valjean Ltr. to the Court, Feb. 4, 2005, A-906-908.) On appeal to the Second Circuit, it argued that it might not be liable for interest on the Cash Advances under the "interest on net balance" rule discussed in <u>Indu Craft, Inc. v. Bank of Baroda</u>, 87 F.3d 614 (2d Cir. 1996). The Second Circuit did not respond to this argument in its 2007 opinion and I find that the case is inapposite here because that discussion of interest on the net balance rule dealt with prejudgment interest under N.Y. C.P.L.R. § 5001(a), which Valjean was already awarded.

[7] Valjean added its monthly expenses to the § 5.1 Valjean Payments and then subtracted the MWI cash payments. It then calculated interest on those net monthly amounts where the MWI cash payments exceeded the Valjean Payment

Once the expenses are subtracted from Valjean's numbers, the total interest that accrued for those months in which MWI Cash Advances exceeded § 5.1 Valjean Payments equals $400,076.11. However, this number is increased to $615,636 by the Diamond Value from Indian-made jewelry as discussed below.

**B. Diamond Value from Indian Made Jewelry**

The Second Circuit vacated and remanded my calculation of Diamond Value, for diamonds contained in Indian-made jewelry. Valjean, 2007 U.S. App. LEXIS, at *6. I accepted the stipulation by the parties during oral argument prior to the second remand that the Indian-made jewelry was classified as "Nova/MWI Diamonds." Valjean, 2006 U.S. Dist. LEXIS, at *16-18. Nova/MWI Diamonds are defined as "any loose diamonds or generic jewelry sold by Nova/MWI through its sales force and invoiced under the Nova/MWI name to its customer." MSA, "Nova/MWI Diamonds." "Diamond Value" means:

> for each piece of Jewelry, the sum of the values of all diamonds included in such piece. The value of the diamonds in such piece shall be an amount equal to the total carats of each category (determined by size, shape, color and quality) of loose diamonds in such piece multiplied by the price per carat for each category of loose diamonds shall be the same as the price per carat for loose diamonds of like size, shape, color and quality which MWI sells to bona fide third-party customers. *If MWI does not regularly inventory a category of loose diamonds used in Valjean Jewelry, then MWI shall purchase those goods on the open market and establish a Diamond Value based on its cost for each category after assortment plus a profit margin averaging 15%.*[8] (emphasis added)

MSA, Definitions, "Diamond Value." The MSA definition of "MWI Costs" includes Diamond Value of the diamonds in Jewelry or Nova/MWI Diamonds, MSA, Definitions, "MWI Costs."

In addition to Diamond Value and MWI Costs, the MSA provides MWI overhead for performance of the contract via the "MWI Charge" of either 8% or 4% of Sales Proceeds depending upon whether the goods were classified as "Jewelry" or "Nova/MWI Diamonds." MSA, Definitions, "MWI Charges."[9] The parties contracted for the Indian-made jewelry after

---

plus expenses. Nothing in the MSA supports the inclusion of expenses to calculate interest on Cash Advances. Valjean was still underpaid even with the removal of the expenses; however, the interest owed to MWI is higher.
[8] MWI argues that Diamond Value is defined as MWI's costs plus a 15% profit: "Nowhere in the MSA is there a provision whereby MWI receives less than costs plus a 15% profit margin for diamonds." (MWI Brief 15.) This is simply wrong. The third sentence makes clear that MWI diamonds in Jewelry are to be valued based on the value of those diamonds which MWI sells to bona fide third-party customers. The last sentence clearly limits the 15% profit margin to non-inventoried diamonds. MSA, Definitions, "Diamond Value."
[9] "'MWI Charges' means MWI's expenses incident to performing this Agreement, including administration, shipping and insurance . . . , which shall be deemed, for one year from the date hereof, to be equal to eight percent of

the execution of the MSA. Once the parties determined that the Indian goods were Nova/MWI Diamonds, I found that applying this definition to the Indian-made jewelry, the Indian-made goods were subject to the 4% MWI Charge. 2006 U.S. Dist. LEXIS, at *18.

In the second appeal, MWI argued that by designating the Indian-made jewelry as Nova/MWI Diamonds, not only should the 4% MWI Charge apply, but the side-stone diamonds found in the Indian-made jewelry should also be subject to the 15% profit margin because these are "loose diamonds not regularly inventoried by MWI" pursuant to the MSA definition above. The Second Circuit held that nothing precluded a finding that the side diamonds in the Indian made jewelry were subject to the 15% profit margin because they could be classified as loose diamonds not regularly inventoried by MWI. 2007 U.S. App. LEXIS 20475, at *7.

After the February oral argument, I asked the parties to prepare a stipulation as to the value of the diamonds in the Indian-made jewelry. The parties submitted their stipulated calculation on April 4, 2008, though Valjean continued to deny that these diamonds were purchased on the "open market" to merit the 15% profit. The parties agreed that the cost of diamonds contained in Indian jewelry over the course of the relationship totals $18,492,331 and that a 15% mark-up on such diamond cost totals $2,773,850. (Stipulated Summ. Potential 15% Mark-Up on Diamonds Contained in Indian Manufactured Jewelry, Apr. 4, 2008.)[10]

I find that nothing precludes treating the side-stones (the only stones at issue here) as loose diamonds subject to the 15% profit due to MWI. Once Valjean demanded that I treat the Indian-made jewelry as Nova/MWI Diamonds, it had to face the prospect that the diamonds used would be treated in accordance with the MSA. By classifying the Indian made jewelry as Nova/MWI Diamonds, the diamonds used in the Indian-made jewelry must receive Diamond Value pursuant to the MWI Costs and Diamond Value definitions. MSA, Definitions, "Diamond Value," "MWI Costs." This 15% markup of $2,773,850, which is an MWI Cost, then further reduces the Valjean Payment pursuant to §5.1 of the MSA.

Valjean argues that the diamonds are part of completed pieces of jewelry and opines that MWI did not purchase them "on the open market"; thus the 15% markup does not apply. But this would mean that the side stone diamonds in the Indian jewelry would be unaccounted for in

---

Sales Proceeds in the case of Jewelry and four percent of Sales Proceeds in the case of Nova/MWI Diamonds. . . ." MSA, Definitions, "MWI Charges."

[10] This chart submitted by both parties contains a monthly calculation of the Diamonds in the Indian jewelry. (Summary of Potential 15% Mark-Up on Diamonds Contained in Indian Manufactured Jewelry, Apr. 4, 2008.)

6

the MSA: they would be neither diamonds from MWI inventory, nor diamonds purchased on the open market. MWI has the better argument here. Valjean's argument that the 15% markup on Diamond Value is limited to "loose diamonds purchased on the open market" is too restrictive. "Loose diamonds" is not defined in the MSA; nor is the language "on the open market."

In addition, Valjean argues that MWI was already paid for the diamonds in the Indian-made jewelry, but that argument misses the point. The Plaintiff refers to the center diamonds, which MWI did provide for the Indian-made jewelry and about which all agree. Diamond Value must be determined not only for the center stones provided by MWI, but also the side stone diamonds provided by the Indian jewelers themselves. Since the Indian side-stone diamonds are not inventoried by MWI, they are subject to the 15% mark up pursuant to the last sentence of the section denominated "Diamond Value" in the MSA. Just to be clear, this Diamond Value is independent of and in addition to the 4% MWI Charge I found in my previous opinion.

The parties have stipulated to a $2,773,850 profit margin on the total value of the Indian side stones. Awarding this amount to MWI entails an adjustment to the interest calculation above because the 15% profit margin reduces the Valjean Payment pursuant to § 5.1 of the MSA. This is because the Valjean Payment is calculated by subtracting MWI Costs from sale proceeds, and Diamond Value is a component of MWI Costs. By deducting the monthly 15% Indian diamond markups, or the total $2,773,850, from the monthly Valjean Payments and applying that reduced amount to the Cash Advances to Valjean, the total underpayments to Valjean is reduced from $5,055,037 to $2,271,188. As explained above, the interest that accrued on Cash Advances was not $4.85 million, but $400,076. As a consequence, the cumulative interest on monthly Cash Advances is increased from $400,076 to approximately $615,636.

**C. Trade Show Expenses of $200,000 under § 3.4 of MSA**

Pursuant to § 3.4 of the MSA, MWI is obligated to cover not less than $200,000 in trade show and marketing and advertising expenses for Valjean up to December 31, 1995. MSA § 3.4. Thereafter, the parties would negotiate what portion of trade show expenses MWI would cover. The trial record shows that MWI spent $194,021.74 on behalf of Valjean in trade show and related expenses between 1994 and 1995. In 2006, I awarded $623,600 to Valjean in trade show/marketing expenses composed of two amounts: 1) the $200,000 guaranteed expenditure by MWI for Valjean for 1994-95; and 2) $423,600 reimbursement for Valjean's own expenditures on certain trade shows from 1996-2003. Given my earlier acceptance of the $194,022, the

Circuit Court asked that I determine whether the $194,022 expenditure was in fact for the benefit of Valjean.

MWI hangs its hat on the Kleinberg Declaration and Exhibit N where Mr. Kleinberg declared that he was asked by Richard Werdiger, the owner and CEO of MWI, to "oversee the gathering of materials in order to determine how much money MWI spent on advertising, trade shows and customer marketing programs in relation to Valjean Manufacturing, Inc. . . . for the period October, 1994 through 2003." (Kleinberg Decl., A-144, ¶ 2.) Kleinberg explained that MWI spent money on "trade shows," "print advertising" as well as "customer incentives," which included "discounts to customers, donations by MWI to customer affiliated charities, or through MWI's participation in industry functions, where MWI would purchase table seating at dinners or similar events." (Kleinberg Decl., A-144-45, ¶¶ 4-6.) After asking staff to collect this data for trial, Mr. Kleinberg reviewed the itemized expenses and "determined that MWI spent the following amounts on trade shows, advertising from 1995 to 2003:

        1995   $194,021.74
        1996   $93,515.81 . . ."

(Kleinberg Decl., A-146, ¶ 9.) The spreadsheet "detailing these expenses is designated as Exhibit N." (Id. at ¶ 10.)

Exhibit N's "detail" is simply a table labeled "Trade Show Expenses" breaking down salesmen trade show expenses, trade shows, shipping for trade shows, advertising, and separately ad allowances by year. (Def. Exh. N, A-1274.) There are no invoices or other receipts to back up the summary. Thus, in 1995, MWI's Trade Show Expenses broke down as follows:

| 1995 Marketing Expenses | Totals |
| --- | --- |
| Salesmen Trade Show Expenses | $15,832.33 |
| Trade Shows | $24,921.63 |
| Shipping for Trade Show | $572.21 |
| Advertising | $64,766.00 |
| Ad Allowances | $87,929.57 |
| **Grand Total including Allowances** | **$194,021.74** |

8

(Def. Exh. N, A-1274.) In other words, the $194,022 MWI spent was comprised of $88,000 in ad allowances and $106,000 in trade shows and advertising.

The parties agreed throughout trial and the first appeal that MWI did spend the $194,022 in 1994-95 in accordance with § 3.4 of the MSA. Relying on the law of the case doctrine, MWI contends that Valjean is precluded from requesting the $194,022 that MWI was found to have spent in 1994-95 and in any case, Valjean waived its right to make such arguments so late in this saga.[11]

Valjean, on the other hand, now argues that nothing except Mr. Kleinberg's declaration relates to trade show, advertising, and customer support program expenditures on behalf of Valjean Manufacturing, Inc. (Kleinberg Decl. ¶ 2, A-144.) The only other support from MWI, again with no documentary corroboration that ties the expenses to anyone or anything, comes from Mr. Richard Werdiger's testimony and the MWI Post Trial Memorandum. There is no other support for the proposition that these expenditures were <u>exclusively</u> to promote "Jewelry manufactured by Valjean with Valjean Designs." MSA, § 3.4. Furthermore, nothing MWI provided in its briefs, at oral argument, or in post-hearing submissions provides additional evidence that identifies the beneficiary of these expenditures.

While Valjean is correct about the limited evidence, one can't help but wonder why Valjean never pressed for the $200,000 in trade show expenses before now? Valjean asked for reimbursement of its own expenditures from 1995 through 2003, but never questioned the $194,022 MWI spent on trade shows in 1994-95. Valjean reviewed the "notebooks" used to tally the expenditures. (Kleinberg Decl. ¶ 8, A-146.) Valjean never challenged the $194,022; instead Valjean sought further reimbursement of for its own expenditures for trade shows and advertising. (<u>See</u> M. Gruber Decl. ¶¶ 62-67, A-185-186.) Everyone's assumption up until this remand has been that MWI did in fact incur the $194,022 in marketing expenses on behalf of Valjean.

In fact, in Valjean's Reply Brief here, there is nary a reference to MWI's argument that Valjean waived its right to challenge the $194,022 that MWI spent in 1994-95.[12] While Valjean

---

[11] MWI's reliance on the "law of the case" doctrine is misplaced. First, the Second Circuit did not find that MWI spent $194,022 on behalf of Valjean – that is precisely why it remanded this question to me. All, including the Second Circuit, agree that MWI spent the $194,022 in marketing – the only question is whether it was for Valjean or for itself.

[12] Nonetheless, the parties spent no less than five faxes debating the issue of these expenditures after the hearing. I think that Valjean raises good points to challenge the expenditures, namely the $88,000 in ad allowances, which had

9

raised the issue in oral argument, I find that this consistent silence, for whatever reason, constitutes a waiver. There is no new evidence presented to attack the declarations of Kleinberg and Werdiger and Valjean had sufficient opportunity to challenge these amounts in the past. Thus, in accord with MSA § 3.4, which obligated MWI to spend not less than $200,000 in trade show and marketing expenses on behalf of Valjean by December 31, 1995, I find that MWI owes $5,978, the difference between the $200,000 minimum to be spent by MWI for Valjean by December 31, 1995 and the $194,022 that it spent.

### III. CONCLUSION

For the reasons stated above and in accordance with sections 5.1 and 2.4 of the MSA, I find that Valjean owes interest on MWI Cash Advances in the amount of $615,636, not the $4,850,140 in interest originally awarded to MWI. This interest amount includes the impact of the 15% profit margin on Indian side-stones. In addition, Valjean owes MWI the Indian side-stone profit margin of $2,773,850 in accordance with the definitions of "Diamond Value" and "MWI Costs" and their application in section 5.1 of the MSA. Finally, I find that MWI spent the $194,022 in trade show/marketing expenses for the benefit of Valjean and that it is liable only for $5,978, the balance of the $200,000 as provided in § 3.4 of the MSA. Thus, my May 18, 2006 Order, which awarded Valjean damages of $4,739,826 plus prejudgment interest from August 18, 2003, is now amended to add $1,466,641 to the amount owed by MWI to Valjean, and thus totals $6,206,467 plus prejudgment interest as of the same date. The Clerk of the Court is instructed to close this matter and any pending motions and remove it from my docket.

**SO ORDERED**
New York, New York
May 13, 2008

_____
U.S.D.J.

---

reduced the cash receipts to arrive at the "Valjean Payment." The information about the $88,000 was clearly available to Valjean at trial and throughout the remands. In fact, Mr. Regan testified about the impact of the ad allowances on Valjean Payments, but never thought to prompt Valjean to make an adjustment to the 1994-95 marketing expenditures for the allowances. Again, none of these missives included any new information.